## Elmer Owens, Alias Melvin Owens v. Commonwealth.

(Decided November 10, 1925.)

### Appeal from Fayette Circuit Court.

1. Criminal Law—In View of Constitutional Guaranty of Jury Trial, Credibility of Witnesses is for Jury.—In view of constitutional guaranty of jury trial, credibility of witnesses is for jury.

2. Homicide—Evidence Held to Sustain Conviction for Murder.— Evidence held to sustain conviction for murder.

3. Criminal Law—Showing of Juror's Conscientious Scruples Against Infliction of Death Penalty, Disclaimed at Time of Trial, Held Not Prejudicial to Defendant.—That one of jurors in later trial admitted conscientious scruples against infliction of death penalty which he had denied at time of defendant's trial held not to show any prejudice to defendant.

4. Criminal Law—Ground for New Trial Not Asserted in Trial Court Held Not Available on Appeal.—Physical inability of defendant's counsel to properly conduct trial, not called to court's attention when case was called, and not made grounds of motion for new trial, held not available as ground therefor on appeal.

5. Criminal Law—Affidavit on Information and Belief that Police Officer had Induced Witnesses to Testify Falsely Against Defendant Held Not Ground for New Trial.—Affidavit on information and belief that police officer had induced witnesses to testify falsely against defendant held not ground for new trial.

6. Criminal Law—New Trial on Ground that Witnesses had Testified Different than Statement Made Before Trial Held Unwarranted.— Where witness was not called by defendant, but by Commonwealth in rebuttal, new trial on ground that her testimony differed from statement made to counsel before trial was unwarranted, particularly in absence of motion for continuance on ground of surprise.

S. JEWELL RICE for appellant.

FRANK E. DAUGHERTY, Attorney General, and CHARLES F. CREAL, Assistant Attorney General, for appellee.

Opinion of the Court by Commissioner Hobson—
Affirming.

Elmer Owens was indicted in the Fayette circuit
court for the murder of Herbert Harris. On the trial of
the case he was found guilty and his punishment fixed at
death. He appeals.

In the brief for the appellant there is no complaint
of the instructions of the court to the jury or of any error
of the court in the admission or rejection of testimony.
On reading the record the court perceives no ground for
complaint as to this. The facts shown by the Common-
wealth are these:

Owens is a negro laborer, so was Harris. The wit-
nesses are practically all negroes. Owens lived on Sec-
ond street in Lexington, next door to Ellen Peters; Har-
ris lived two doors from her. The houses in which they
lived consisted of two rooms, one behind the other, with
a back door and a front door and a door between the two
rooms, but the middle door was not in line with the other
two. On the morning of the homicide, about a quarter
to eight o'clock, Harris was in the front room of Ellen
Peter's house talking to her and her two daughters.
One of the daughters requested him to get her garters
for her from the back room. Harris started to the back
room, but before he got to the door they heard Owens at
the rear of the house holler, "Hello, vamps." They
hollered, "Hello, Melvin." Immediately after this a
shot was fired, and before anything else was said, Harris
ran by them through the front room, with Owens follow-
ing him and shooting at him. He shot three shots at
him before Harris got out of the room. Harris in run-
ning dropped one of his shoes on the porch and contin-
ued to run across the street. As he went across the
street Owens fired at him again. Harris then disap-
peared from view, turning in the direction of Lee street,
and when he appeared on Lee street, Owens, who had
followd him to the corner, began shooting at him again
and shot at him until he fell, as he was running away
from Owens. Harris was shot once through the chest,
the ball lodging in the back, as one witness states, or as
another states, coming out at the back. He was also
shot in the arm and in the leg, but these last two wounds
did not produce his death. He died a few days later.
Owens immediately left Lexington and about a year
later was arrested in Ohio and brought back for trial.

This is the substance of the testimony of the four persons that were present at Ellen Peter's house and of two or three persons who saw the parties on the street after Harris fled from the house. Harris was entirely unarmed. The Commonwealth also showed by two witnesses that during the night before the homicide Owens had come to their house and offered each of them two dollars to lend him their pistol for twenty minutes, but each of them declined to do so.

On the other hand, the defendant testified that he and Harris had been good friends until the evening before; that they slept in the same house, which was the house of Henry Mullins, who was in the workhouse and had left the house in charge of Owens. On the night before, about ten o'clock, he and Mullins and some other negroes had met at the house of Jennie Normal and had there drunk very copiously of wine and whiskey together. After this Harris approached Owens and wanted him to give him the key to the house so he could take Mullins' wife there and stay with her that night. Harris declined to give him the key for this purpose. Thereupon they had a little fight and after this Harris was hostile to him and said he would kill him. Later he went down to the house and found Harris and the Mullins woman there in bed. He thereupon left the house and slept at another place. The next morning he had Ada Smith, who was his mistress, to go up there and get his breakfast and bring it to him. After eating his breakfast he concluded to go up there and get his clothes. As he approached the house he saw Harris on Lee street and said "good morning," like he would speak to any friend. Harris cursed him and said he would kill him, and he then wheeled and left Harris, Harris saying to him, "I told you you couldn't stay here," and said he was going to get his pistol and kill him. Owens went on to the house to get his clothes and when he got his clothes got his pistol. He needed a key and went over to Ellen Peter's, thinking perhaps the key was left there. He knocked on the door; they said "come in." He had been in there about three minutes when Harris came in. He walked in the door with his hand on his hip; he was not expecting to see him at all. The girl was standing up in the floor combing her hair and said, "Herbert, behave yourself." At this he broke out to the back door, and when he got to the door it was locked and he couldn't open it. He then

started back to the middle door, and when Harris started toward him with his hand on his hip he fired four shots at him; that Harris fled from the room and he stayed there and did not shoot any more.

The defendant was the only witness on his behalf as to the facts of the homicide, and his testimony was contradicted by the testimony of the Commonwealth, which showed that Harris was there long before he appeared; that it was in July and the doors were all open; that it was about eight o'clock in the morning and that what happened the night before at the Normal house was that Owens was in a fuss with Ada Smith and another woman, and Harris simply pulled them apart, acting only as a peacemaker and making no threats at all.

The defendant introduced several witnesses who testified that he was a good worker and had borne a good reputation for peacefulness previous to the homicide. The chief ground for reversal is that the death penalty is unwarranted under the evidence. It is earnestly insisted that the fact is that Owens and Harris were chums and good friends until the night before; that on that night both of them got very drunk and while drunk had a difficulty, and that under any view of the facts the shooting the next morning was the result of this difficulty. The proof leaves no doubt that Owens and Harris were chums and friends up to the difficulty on the night before. If the defendant's evidence was true he did not seek Harris the next morning for the purpose of shooting him; but if the Commonwealth's evidence was true the jury were warranted in concluding that he armed himself with his pistol after failing to borrow a pistol from two other people and learning that Harris was in the house next door went there and as soon as he saw Harris began shooting at him. The Constitution guarantees a jury trial in these cases, and so this court has laid down the following rule as to the effect of the verdict of the jury:

"The credibility of the witnesses is for the jury, and this court will not disturb a verdict because the jury believed one set of witnesses rather than another. The verdict must be palpably against the evidence or it cannot be disturbed." Wilson v. Commonwealth, 140 Ky. 3.

This rule has been steadily maintained by the court. See cases collected in Caldwell's Notes, vol. 5, p. 1407, vols. 6-7, p. 1959. Clearly it cannot be maintained here that the verdict is clearly or palpably against the evidence.

On the motion for new trial it was shown that one of the jury, H. B. Royce, in answer to the question whether he had conscientious scruples against the infliction of the death penalty, stated that he had not, but that a day or two thereafter on examination as to his qualification as a juror in the trial of a white person on a murder charge, he stated that he did have conscientious scruples against the infliction of the death penalty. If Royce had conscientious scruples against the death penalty and concealed this fact this might be prejudicial to the Commonwealth. But it is hard to see how it would be prejudicial to the defendant. Royce agreed to the verdict and there is no showing that he had any less scruples as to the death penalty in the case of a white man than in the case of a negro.

It was also urged as a ground for new trial that the defendant's attorney, through loss of sleep the night before the trial, due to illness of members of his family, was unable to handle his case in the manner in which he otherwise would have handled it; but when the case was called this objection was not made and the case went to trial by consent. In the affidavit of counsel filed on the motion for new trial nothing is said about this. The objection, therefore, is not available here.

In his affidavit filed on the motion for new trial counsel states "that he is informed and believes and upon such information and belief states as a fact" that Joe Brant, a peace officer, who arrested Owens and brought him back from Ohio became offended because Owens did not employ the attorney Brant wished him to employ and talked with the witnesses and caused them to testify against the defendant regardless of the truth or falsity of their testimony by reason of the prejudice he so created in their minds. But no proof was offered to sustain this affidavit, which on its face shows it was not based upon personal knowledge but only on information. This ground for a new trial can not, therefore, be sustained. It was also urged on motion for new trial that Ada Smith stated on the trial an entirely different story from that stated to counsel before the trial. But the

fact is Ada Smith was not called as a witness for the defendant. She was only called by the Commonwealth as a witness in rebuttal; she was not present at the homicide; no motion for continuance on the ground of surprise was made. Her testimony only related to the origin of the difficulty on the night before and could have had little effect on the result of the trial.

On the whole case no substantial error to the prejudice of the defendant appears.

Judgment affirmed.